**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CARTIER INTERNATIONAL A.G.; CARTIER, a division of RICHEMONT NORHT AMERICA, INC.; and VAN CLEEF & ARPELS, S.A.,

                    Plaintiffs,

v.

DANIEL MARKUS, INC., D & M JEWELRY INC. (both of the foregoing d/b/a/ DANIEL MARKUS JEWELERS); DANIEL RISIS; MARGARITA RISIS; CONCEPT DESIGNS UNLIMITED, INC.; ZURA KAZHILOTI; MARKET STREET HOLDINGS, LLC; and VARIOUS JOHN and JANE DOES and XYZ COMPANIES (not yet known),

Civ. No.  10-1459 (KM)

**O P I N I O N**

*Appearances by:*

Keith J. Miller, Esq.
ROBINSON WETTRE & MILLER LLC
One Newark Center, 19th fl.
Newark, NJ 07102

John P. Margiotta, Esq.
Laura Popp-Rosenberg, Esq.
Anna P. Leipsic, Esq.
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017

        *Attorneys for Plaintiffs*

Saul W. Bienenfeld, Esq.
BIENENFELD & ASSOCIATES, P.C.
26 Broadway Ave.

New York, NY 10004

Noah M. Burstein, Esq.
722 Washburn St.
Teaneck, NJ 07666

     *Attorneys for Mr. Kazhiloti*

**DEBEVOISE, Senior District Judge**

     This case arises out of claims for trademark violations, brought by world-renown

designers and purveyors of luxury jewelry products.  Plaintiffs Cartier International AG, Cartier,

a division of Richemont North America, Inc., and Van Cleef & Arpels, S.A. (collectively,

"Plaintiffs") seek summary judgment and damages against defendant Zura Kazhiloti for the sale

of high-quality counterfeits at high prices and on an enormous scale resulting in hundreds of

thousands of dollars in revenues.

     Mr. Kazhiloti has asserted his Fifth Amended right against self-incrimination at every

turn, and has failed to submit affirmative evidence to dispute any genuine issue of material fact

here.  For the reasons stated below, the motion for summary judgment is GRANTED as to all

counts.

**I.     BACKGROUND**

   **a.  Factual History**

     Defendants Daniel Markus, Inc., D&M Jewelry Inc., Daniel Risis, Margarita Risis and

Market Street Holdings, LLC (the "DM Defendants"), doing business as "Daniel Markus

Jewelers," sold jewelry through their brick-and-mortar stores in New Jersey, through their

website www.dmjewel.com, and through the Internet auction site eBay.  In February and March

2010, the DM Defendants sold, at very high prices, several high-quality jewelry items bearing

counterfeit versions of Plaintiffs' trademarks to Plaintiffs' agents.  On April 1, 2010, Plaintiffs

2

also seized numerous jewelry items bearing counterfeit versions of Plaintiffs' trademarks from the DM Defendants' retail locations, pursuant to a seizure order by the Court.  These counterfeits are also of high quality and very close simulations of Plaintiffs' authentic pieces.

In total, twenty-four counterfeit versions of Cartier jewelry pieces were purchased or seized from the DM Defendants, including counterfeit versions of pieces from Cartier's Love, Trinity, Panthere de Cartier and Lanieres collections, as well as pieces bearing Cartier's stylized "C" design mark and Cartier's other product design marks.  Each piece bears a counterfeit version of the CARTIER mark.  Some of the design pieces bear serial numbers that do not correspond to any authentic piece or bear no serial number at all, and other pieces display improper settings, dimensions and markings that do not match authentic Cartier pieces.

In total, eighty-three counterfeit versions of Van Cleef & Arpels jewelry pieces were purchased or seized from the DM Defendants, including counterfeit versions of pieces from Van Cleef & Arpels' Alhambra, Birds of Paradise and Fleurette collections, as well as counterfeit versions of Van Cleef & Arpels' Eternity wedding bands.  Each piece bears a counterfeit version of the VAN CLEEF & ARPELS and/or the VCA mark.  Various jewelry pieces of the DM Defendants incorporate stones of inferior quality, and/or inferior cuts, chains and clasps that differ from those on authentic pieces, different product configurations from authentic pieces, incorrect engravings and marks, and/or serial numbers that do not correspond to any authentic piece or that are repeated on multiple items.

In addition to the purchased or seized pieces, counterfeit versions of necklace and bracelet purportedly from Van Cleef & Arpel's Alhambra collection had been sold to an unsuspecting customer.  The customer had noticed that the two pieces bore the same serial

number, suspected on this basis that these pieces may be counterfeits, and brought the issue to Van Cleef & Arpels' attention.  (See Pls.' Mot. Summ. J., Luchsinger Decl. ¶¶ 27-28, Ex. 58.)

Additionally, as of March 8, 2010, the DM Defendants advertised and offered for sale on their website forty-three jewelry products under Plaintiffs' marks.  The total value of the jewelry items offered for sale on the website was greater than $1 million, with individual pieces ranging in price from $900 to $145,000.  Several products advertised as Plaintiffs' pieces were also offered for sale through the Internet auction site eBay.  Although the DM Defendants were generally careful to conceal the serial numbers engraved on the pieces portrayed on their website or on eBay, a photograph of one product on eBay displayed a serial number that Van Cleef & Arpels determined to be incorrect and therefore counterfeit.

On April 5, 2010, defendant Daniel Risis testified that he purchased all of the Van Cleef & Arpels jewelry items and most of the Cartier jewelry items offered for sale by the DM Defendants from co-Defendants in this action, Mr. Zazhiloti and CDU, of which Mr. Zazhiloti is the principal officer.  Mr. Kazhiloti told Mr. Risis that Plaintiffs had engaged Mr. Zazhiloti to release overstock jewelry "through the back end." (Id., Margiotta Decl., Ex. 12, Risis Tr. 58:12-59:1; 62:10-24.)  Mr. Risis testified that he visited Mr. Zazhiloti at CDU's offices approximately two dozen times to purchase counterfeit items; that every piece of Van Cleef & Arpels jewelry that Mr. Risis sold was purchased from Mr. Kazhiloti; and that most of the Cartier pieces that Mr. Risis sold were purchased from Mr. Kazhiloti. (Id. at 36:4-15, 52:8-10, 83:8-13.) Additionally, Mr. Risis testified that Mr. Kazhiloti supplied him with certificates of authenticity that purported to certify that the jewelry pieces were authentic, and that Mr. Risis distributed these certificates to his customers.  (Id. at 37:5-38:5, 53:12-58:11, 68:19-69:19.)  However, it is

undisputed that certificates of authenticity provided by Mr. Kazhiloti were fake.  (See Pls.' MSJ Br., Hallerman Decl. ¶¶ 10, 13, Exs. 38-41.)

Mr. Risis further testified that the counterfeit pieces sold by the DM Defendants to an unsuspecting customer were also provided by Mr. Kazhiloti.  According to Mr. Risis, when he confronted Mr. Kazhiloti with the fact that the purported Van Cleef & Arpels pieces sold to the customer bore duplicate serial numbers, Mr. Kazhiloti explained that this was the result of "human error" and that sometimes authentic pieces have duplicate serial numbers. (Risis Tr. 105:1-108:5.)  However, Mr. Kazhiloti's explanation was not true because neither Plaintiff ever repeats serial numbers on their jewelry.  (See Abramo Decl. ¶ 18; Luchsinger Decl. ¶ 20.)

Mr. Risis further testified that Mr. Kazhiloti provided the DM Defendants with product sheets showing reference numbers and prices, which represented counterfeit Cartier and Van Cleef & Arpels inventory available for purchase from Mr. Kazhiloti.  (Risis Tr. 83:18-85:1.)  Mr. Kazhiloti's product sheets display various of Plaintiffs' marks, including the CARTIER, TRINITY, PANTHERE DE CARTIER and LANIERES marks, the stylized LOVE mark, Cartier's "C" design mark, Cartier's screwhead design mark, the VAN CLEEF & ARPELS mark and the VCA mark in logo form. (Margiotta Decl. ¶ 19, Ex. 14.)

Mr. Risis also testified that the DM Defendants sold approximately $50,000 worth of Cartier merchandise to consumers each month from July 2009 through March 2010, and that most of this merchandise was purchased from Mr. Kazhiloti.  (Risis Tr. 83:8-13, 113:7-12.)  They sold "almost the same" dollar amount of Van Cleef & Arpels merchandise each month, and this entire amount was purchased from Mr. Kazhiloti. (Id. at 52:8-10, 132:19-133:16, 141:10-142:1.)  Thus, the DM Defendants made approximately $900,000 in sales of counterfeit versions

of Plaintiffs' jewelry over the nine-month period from June 2009 through March 2010 – virtually all of which was purchased from Mr. Kazhiloti.

After his deposition, Mr. Risis produced to Plaintiffs a handwritten invoice, which he identified as an invoice from Mr. Kazhiloti.  (Margiotta Decl. ¶ 22, Ex. 15.)  Mr. Risis confirmed that this invoice showed his purchase of nearly $90,000 worth of jewelry from Mr. Kazhiloti on July 19, 2009, and confirmed that Mr. Kazhiloti never put his or CDU's name on any invoice. (Id.; see also Risis Tr. 100:21-101:2.)  The business records seized from the DM Defendants included thirty-eight such invoices, dated from June 22, 2009 to February 9, 2010, each following the same format as the invoice identified by Risis at his deposition.  (Margiotta Decl. ¶ 23, Ex. 16.)  The total amount shown on the invoices is approximately $1,191,318. (Id. ¶ 23, Ex. 17.)

Mr. Kazhiloti's invoices identify some of the counterfeit Cartier and Van Cleef & Arpels jewelry items sold by Mr. Kazhiloti to the DM Defendants, including but not limited to a Cartier "PANTHEIRE" items sold on July 13, 2009 for $3,500 (id., Ex. 16 at 6); three Cartier "LANIER [sic]" jewelry pieces sold on July 19, 2009 for $4,300 (id., Ex. 16 at 9); five pieces from Cartier's "LOVE" collection sold on July 19, 2009 for $8,400 (id.); a Cartier "TRINITY" item sold on August 3, 2009 for $9,500 (id., Ex. 16 at 11); and numerous jewelry pieces described as "VC," clearly shorthand for "Van Cleef" (see e.g., id. Ex. 16 at 2.)  Although these and other items listed on Mr. Kazhiloti's invoices are identifiable as Plaintiffs' goods, most items are described in such a way as to make the brand difficult, if not impossible, to ascertain. (See id.) The highly secretive nature of the invoices – handwritten, with no identification of buyer or seller and little to no description of the goods – suggests that Kazhiloti was aware of, and sought to conceal, the illicit nature of his counterfeit jewelry business. (See id. ¶ 24, Ex. 16.)

6

On April 27, 2010, Plaintiffs' counsel served a subpoena on JPMorgan Chase Bank N.A. ("JPMorgan"), amount other banks, requesting the bank records of CDU. (Margiotta Decl. ¶ 26, Ex. 18.)  JPMorgan produced bank records for Checking Account No. 151167840365 in the name of CDU, with Mr. Kazhiloti and non-party Irina Kazhiloti as the account signatories. (Id., Ex. 18 at 1.)  The bank records show twenty checks made from defendant Daniel Markus, Inc. to CDU, dated from July 15, 2009 to March 28, 2010, in the total amount of $249,650. (Id. Ex. 18 at 2-21.)  The DM Defendants also made fourteen payments by wire transfer to CDU, dates from August 6, 2009 to March 9, 2010, in the total amount of $230,000. (Id., Ex. 18 at 22-29; see also Risis Tr. 102:19-103:6 (testifying that Risis paid CDU for some jewelry items by wire transfer).)

The total amount of check and several wire transfer payments from DM Defendants to Mr. Kazhiloti's company CDU during the period from July 2009 to March 2010 is $479,650. (Margiotta Decl. ¶ 27, Ex. 19.)  The total payments from the DM Defendants to Kazhiloti is higher, however, since Mr. Risis testified that he also made payments in cash (Risis Tr. 65:8-9), which are not identified in the bank records.

### b.  Procedural History

On March 22, 2010, Plaintiffs filed a complaint against Daniel Markus, Inc., D & M Jewelry Inc., Daniel Risis and Margarita Riss, alleging unlawful promotion, distribution, and sale of very expensive counterfeit jewelry that used imitations of Plaintiffs' famous CARTIER and VAN CLEEF & ARPELS trademarks, along with numerous other trademarks owned by these companies.  The complaint set forth claims for trademark infringement and counterfeiting under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); unfair competition and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution and tarnishment under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); unfair competition under N.J.S.A.

§ 56:4-1, et seq.; trademark dilution and tarnishment under N.J.S.A. § 56:3-13.20; and unfair competition under New Jersey common law.  On April 12, 2010, following Mr. Risis's testimony identifying Mr. Kazhiloti and CDU as the sources of the counterfeit jewelry, Plaintiffs filed an Amended Complaint to add as defendants Zura Kazhiloti and Concept Designs Unlimited, Inc. ("CDU"), of which Mr. Kazhiloti is a principal.

On July 21, 2010, Mr. Zazhilto filed his answer to the Amended Complaint, in which he uniformly neither admitted nor denied the allegations therein, and invoked his Fifth Amendment privilege against self-incrimination. Mr. Kazhiloti asserts no defense in the litigation, and instead invokes his Fifth Amendment right against self-incrimination at every opportunity. (Margiotta Decl. ¶¶ 32-37.)  Mr. Kazhiloti asserted the Fifth Amendment in response to every factual allegation of Plaintiffs' Amended Complaint (id. ¶ 33, Ex. 24.); in response to every written discovery request (id. ¶¶34-36, Exs. 25-31); and in response to every substantive question during his deposition (id. ¶ 37, Ex. 32 (Kazhiloti Tr.)).  He also refused to produce any documents in this action. (Id. ¶ 36.)

On November 5, 2010, the DM Defendants entered a counterclaim against Plaintiffs for unauthorized seizure under the Lanham Act, 15 U.S.C. 1116(d)(11),  tortious interference with prospective economic advantage, tortious interference with contractual relations, for declaratory judgment, and equitable relief.  Additionally, the DM Defendants entered a cross-claim against Co-Defendants Kazhiloti, CDU, and unnamed individuals, partnerships, and corporations, for indemnification and contribution; common law fraud based on Mr. Kazhiloti's representation, assurance, and guarantee that all Cartier and Van Cleef & Arpels pieces purchased from Mr. Kazhiloti and CDU were authentic; breach of contract; unjust enrichment; quantum meruit; breach of implied covenant of good faith and fair dealing; tortious interference with contractual

relations; tortious interference with prospective economic advantage; violations of the New Jersey Consumer Fraud Act; and accounting and disgorgement of profits.

On November 22, 2010, Mr. Zazhilito filed his answer to the counter-claim and cross-claim, in which he again uniformly invoked his Fifth Amendment privilege against self-incrimination.

On September 2, 2011, Judge Linares entered a default judgment against CDU on all claims, and awarded Plaintiffs injunctive relief and more than $37 million in statutory damages, which has yet to be paid.  (See Order Granting Def. J., Sept. 2, 2011, ECF 72.)  The Court noted that the facts and evidence submitted by Plaintiffs had not been denied or contested.  (Id. ¶ 7.) Accepting Plaintiffs' allegations in its Amended Complaint as true, the Court found that CDU was identified by defendant Daniel Risis as the supplier for all of his Van Cleef & Arpels jewelry items and most of the Cartier jewelry items which he purchased.  (Id. ¶ 8.)  CDU's invoices and bank records confirmed sales of inauthentic Cartier and Van Cleef & Arpels Jewelry from CDU to Daniel Markus Defendants. (Id.)  Subsequent to the Court's Order for Seizure, Plaintiffs' counsel seized from CDU's offices 69 catalogues showing Cartier jewelry, 22 catalogues showing Van Cleef & Arpels jewelry, a jewelry reference book showing numerous jewelry designs, paper showing famous jewelers' hallmarks, and a letter from Defendant Kazhiloti to the French Trade Commission and French chamber of Commerce requesting a reference book that would help him identify French jewelry makers that stamp a diamond symbol on their jewelry as Van Cleef & Arpels does.  (Id. ¶ 9.)

The Court noted that "Defendant CDU has failed to file responsive pleadings regarding Plaintiffs' Motion for Default, and even though CDU counsel has appeared on behalf of CDU's principal, Defendant Kazhiloti, counsel has not appeared for CDU in this action to present any

defense.  Further, CDU's failure to answer has prejudiced Plaintiffs in preventing them from prosecuting their case, engaging in discovery and seeking relief.  Accepting Plaintiffs' allegations to be true, Defendant CDU engaged in willful acts directed at Plaintiffs' Marks for which Plaintiffs have stated sufficient causes of action to find culpability." (Id. ¶ 12.)   The Court thus entered judgment for Plaintiffs and against CDU as to all of Plaintiffs' claims.

   On November 16, 2012, the Court entered a Final Order and Judgment on Consent ("the Judgment") with respect to the DM Defendants.  The Judgment resolved all claims and counter-claims in Plaintiffs' favor.  The DM Defendants agreed to pay a monetary award to Plaintiffs and to be enjoined from using any of Plaintiffs' Marks, and any other marks associated with any brands owned by Richemont North America Inc., and other injunctive relief.  The Judgment does not apply to Defendants CDU, which has yet to pay the statutory damage award of $37 million pursuant to default judgment, or its principal Zura Kazhiloti.  Currently before the Court is a motion for summary judgment against Mr. Kazhiloti, who is the sole remaining defendant in this action.

   The moving brief is supported by references the over fifty accompanying exhibits, while the opposition brief does not submit any affirmative evidence.  Indeed, the opposition brief does not cite to the Plaintiffs' exhibits or dispute the evidence, and only includes five largely immaterial exhibits including a prior unrelated arrest and charge against Mr. Risis for sale of marijuana; a basic complaint lodged against Mr. Risis for the alleged use of a domain name in violation of the Anti-Cybersquatting Consumer Protections Act; and an incident police report filed by Mr. Kazhiloti alleging harassment, although the perpetrator of the harassment is unnamed.  The main thrust of the opposition brief is to suggest that there is no dispute of genuine issue of material fact because Mr. Kazhiloti pleaded the Fifth Amendment as to all matters of

fact, therefore the moving party has failed to meet its burden to illustrate a genuine dispute, and that any testimony submitted by Mr. Risis should be ignored by the Court because Mr. Risis is a person of interest in this case.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of  law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact. Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999). <u>See also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").

Moreover, the nonmoving party must show by competent evidence that factual disputes regarding material issues of fact exist.  "[O]nly evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F. Supp. 474, 482 (D.N.J. 1995).

## B. Analysis

By Mr. Kazhiloti's pleading the Fifth Amendment at every turn, and his failure to produce affirmative evidence to indicate any factual disputes regarding material issues of fact, the Court is persuaded that the record supports the moving documents and summary judgment must be granted to Plaintiffs as to all counts.  Again, Mr. Kazhiloti has simply plead the Fifth Amendment throughout the course of this litigation, and has not so much as denied that he sold the counterfeit jewelry in question to Plaintiffs' agents and the DM Defendants.

To the extent that CDU sold or offered for sale replicas of Plaintiffs' jewelry products in connection with counterfeit versions of Plaintiffs' goods, Mr. Kazhiloti is personally liable for these actions because he was the sole moving, active and conscious force behind CDU's activities.  Mr. Kazhilti was the principal officer of CDU and listed as a signatory on CDU's bank records, and the undisputed record establishes that he was the sole, active force behind CDU's activities.  <u>See</u> <u>e.g.</u>, <u>Donsco, Inc. v. Casper Corp.</u>, 587 F.2d 602, 606 (3d Cir. 1978) (finding corporate officer personally liable for unfair competition where the officer "authorized

and approved the acts of unfair competition which are the basis of [the corporation's] liability.");

Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F. Supp. 1035, 1043 (D.N.J.

1990) ("Any person who has the ability to supervise the infringing activity and has an obvious or

direct financial interest in that activity or has personally participated in that activity can be held

personally liable for infringement."); see also Chanel, Inc. v. Italian Activewear of Fla., Inc., 931

F.2d 1472, 1478 (11th Cir. 1991) (affirming summary judgment award finding individual liable

for trademark counterfeiting where he was a principal officer of corporate defendant and

operated the showroom from which the products were sold).

1. **Lanham Act claims of trademark counterfeiting and infringement, and unfair competition.**

To establish a Lanham Act claim of federal trademark infringement, 15 U.S.C.

1114(1)(a)[1], the record must demonstrate that Plaintiffs (1) have a valid and legally protectable

mark; (2) own the mark; and (3) Mr. Kazhiloti's use of the mark to identify goods causes a

likelihood of confusion. See Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d 532, 536 (D.N.J.

---

[1]      Section 1114 provides:

> Any person who shall, without the consent of the registrant (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution,   or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

> 15 U.S.C. § 1114(1) (a), (b).

2008) (internal reference omitted).  The first two requirements are satisfied when a federally registered mark has become incontestable, meaning the owner has filed affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there has been no adverse decision concerning the registrant's ownership or right to registration. Id. (referencing Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466 (3d Cir. 1994)).

To establish federal trademark counterfeiting, the record must establish that (1) Mr. Kazhiloti infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. 1114(1)(a), supra, and (2) intentionally used the trademark knowing that it was counterfeit or was willfully blind to such use.  See id.  "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was counterfeit." Id. at 536-37.

Federal trademark infringement is established here as a matter of law.  A registration owned by a party to an action is *prima facie* evidence of the validity of the registered mark and the registrant's ownership of the mark.  See 15 USC § 1115(a).  Since Mr. Kazhiloti's use of marks is identical to Plaintiffs' registered marks in connection with counterfeit versions of Plaintiff's goods, a likelihood of confusion is clearly established here.

Mr. Kazhiloti sold jewelry pieces bearing the marks of CARTIER or VAN CLEEF & ARPELS and/or VCA (in print or logo form); sold these pieces bearing Plaintiffs' registered product design trademarks, such as U.S. Registration No. 1,372,423 for the design of a Cartier Love bracelet and U.S. Registration No. 1,535,215 for the design of a stylized letter "C" as used in certain Cartier jewelry pieces; and sold jewelry pieces under Plaintiffs' registered trademarks standing for various collections of jewelry, such as Cartier's TRINITY and LANIERES

14

collections and Van Cleef & Arpels' ALHAMBRA collection.  Mr. Kazhiloti used some of these trademarks in his handwritten invoices, such as TRINITY, and other trademarks, such as the stylized LOVE trademark, in the product sheets he gave to the DM Defendants.  There has also been evidence of actual confusion, as the record establishes that at least one consumer purchased expensive counterfeit pieces from the DM Defendants (which originated from Mr. Kazhiloti), believing them to be authentic, when in fact they were not.

Mr. Kazhiloti, acting through CDU, sold the counterfeit jewelry to the DM Defendants. Mr. Risis testified that Mr. Kazhiloti was the only person he dealt with at CDU, and that Mr. Kazhiloti supplied him with the fake Cartier and Van Cleef & Arpels products.  Mr. Kdazhiloti's handwritten invoices reflect the sales of the counterfeit jewelry.  Subpoenaed bank records confirm Mr. Risis's testimony, showing that the DM Defendants made large payments to CDU during the period in question and that some of these payments correspond to notations on Kazhiloti's invoices.  Neither Mr. Kazhiloti nor CDU has disputed any of this evidence.  Thus, there is no genuine issue of material fact as to whether the jewelry purchased by Plaintiffs' agent from the DM Defendants, the jewelry purchased by unsuspecting customers, the jewelry seized from the DM Defendants, the jewelry advertised as "Cartier" and "Van Cleef & Arpels" pieces and offered for sale on the DM Defendants' websites, and the jewelry pieces advertised on the product sheets originated from Mr. Kazhiloti.

Nor could a reasonable juror find in favor of Mr. Kazhiloti with regard to the second element of the federal trademark counterfeiting claim, regarding his intentional use of a trademark knowing that it was counterfeit or willful blindness to such use.  Again, neither Mr. Kazhiloti nor CDU has disputed any of the evidence.  The evidence seized from Mr. Kazhiloti's includes numerous catalogs of Plaintiffs' jewelry, his papers showing famous jewelers'

hallmarks, and his letter to I.N.P.I France requesting a reference book that would help him identify French jewelry makers that stamp a diamond symbol on their jewelry (as Van Cleef & Arpels does).  Further, the secretive nature of his invoices, which lack any company name or other identification, also establishes his knowledge and willfulness, as does the fact that he supplied the DM Defendants with fake certificates of authenticity.  Further, according to Mr. Risis, Mr. Kazhiloti represented that he sold Plaintiffs' jewelry outside of the normal distribution channels because they were overstock pieces, and that the duplicate serial numbers were a result of "human error" on Plaintiffs' part.  Last but not least, Mr. Kazhiloti produced fake certificates of authenticity alongside the counterfeit jewelry.

      Mr. Kazhiloti's only assertions are to plead the Fifth Amendment.  Indeed, Mr. Kazhiloti invoked the Fifth in response to virtually every factual allegation in the Amended Complaint, every written discovery request, and every question posed during his deposition.  Mr. Kazhiloti cannot avoid liability here simply by pleading the Fifth, as the standard to overcome Plaintiffs' motion for summary judgment is to establish a genuine dispute of material fact.  Rather than submit affirmative evidence indicating otherwise, Mr. Kazhiloti's counselor, Saul Beinenfeld, Esq., filed a Declaration in lieu of a more formal opposition brief, in which he contests the veracity and relevance of Plaintiffs' evidence.  (See Opp. Br., ECF 109.)  Even if the Court were to overlook the Local Civ. R. 7.2 requirement that declarations be restricted to statements of fact within the personal knowledge of the signatory, with no argument of fact and law contained therein, Mr. Kazhiloti has not supplemented the record with affirmative proof to support his allegations of the existence of alternate theories to dispute the relevance of Plaintiffs' pertinent evidence.  Further, Mr. Kazhiloti has not so much as denied the illicit sales of the counterfeits to the DM Defendants.

Mr. Kazhiloti's main contention is that Mr. Risis is an interested witness, and therefore evidence that originates from Mr. Risis raises questions of credibility and should not be credited. Mr. Kazhilti argues that "Risis' testimony is the only evidence that the Plaintiffs have indicating that the counterfeit jewelry he sold was bought from Kazhiloti.  Without this there is no nexus between Kazhiloti and the jewelry."  (Opp. Br. ¶ 9.)

However, Mr. Risis has no motive to lie about Mr. Kazhiloti's being the source of the counterfeit jewelry, because Mr. Risis is a joint tortfeasor and therefore cannot avoid liability by identifying his source.  See e.g., Stabilisierungsfonds Fur Wein v. Kaiser Stul Wine Distribs. Pty. Ltd., 647 F.2d 200, 207 (D.C. Cir. 1981) ("Courts have long held that in . . . trademark . . . cases, any member of the distribution chain  can be sued as an alleged joint tortfeasor.").  Indeed, judgment has already been entered against Mr. Risis who is among the DM Defendants.

Aside from Mr. Risis's testimony, which names Mr. Kazhiloti as the source for the jewelry, Mr. Kazhilo argues that the Court should not be moved by the relevant invoices and bank records which *do* in fact establish a nexus between the two actors.  Specifically, Mr. Kazhiloti convolutedly argues that the invoices offer no proof because "[t]hey do not have any insignia indicating that they came from Kazhiloti and even if you believe they did come form [sic] Kazhiloti, there are many innocent reasons for them and do not point to proof that Kazhiloti sold counterfeit jewelry to Risis.  Both gentlemen were in the jewelry business so assuming arguendo that they are genuine invoices it could be argued that these invoices had nothing to do with the jewelry in question.  Furthermore, Kazhiloti has invoked his Fifth Amendment privilege and these invoices may be proof of financial crimes that may have taken place between the convicted felon Risis and Kazhiloti." (Id. ¶ 12 - 13.)  With regard to the bank records in evidence, Mr. Kazhiloti counters that they only prove that there was money transferred from Mr.

Risis to Mr. Kazhiloti, and that "[t]here are numerous innocent and not so innocent reasons why a drug dealer would transfer money to a jeweler and do not point to one selling the other counterfeit jewelry.  Among the innocent reasons include selling any other type of jewelry, among the not so innocent include money laundering." (Id. ¶ 15.)

The record contains no actual evidence to indicate that the bank transfers and invoices relate to the sale of legitimate jewelry, or even other illegitimate jewelry or other illegitimate actions as alluded to by Counselor Beinenfeld.  The Court simply cannot rely on the allegations of an attorney which are not supported by the factual record.

> [I]t is now axiomatic that a nonmoving party . . . cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect.  If a moving party has demonstrated the absence of a genuine issue of material fact – meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment.

> See SEC v. Antar, 44 Fed. App. 548, 554 (3d Cir. 2002) (internal quotations and citation omitted).

Plaintiffs urge the Court to draw an adverse inference on the basis of Mr. Kazhiloti's refusal to testify on the basis of the Fifth Amendment, permitting an inference that the answers that he would have provided would have been unfavorable.  See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (In civil cases, "the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them."); see also United States v. Stelmokas, 100 F.3d 302, 311 (3d Cir. 1996).  Indeed, the Third Circuit Court of Appeals has held that under these circumstances, an adverse inference is appropriate so long as there is "other evidence against the defendant [that] could support that result." S.E.C. v.

Graystone Nash, Inc., 25 F.3d 187, 191 (3d Cir. 1994); see also Rad Servs., Inc. v. Aetna Cas. & Sur. Co., 808 F.2d 271, 277 (3d Cir. 1986) (district court did not err in instructing jury that they may, but need not, draw adverse inference from invocation of Fifth Amendment). A drawing of adverse inference here is proper, although not necessary, as the undisputed evidence shows Mr, Kazhiloti's intentional use of counterfeits of Plaintiffs' marks in connection with counterfeit replicas of Plaintiffs' jewelry.

There being no genuine dispute of relevant evidence, summary judgment is granted in Plaintiffs' favor for trademark counterfeiting and trademark infringement in violation of U.S.C. § 1114(1)(a).

Because trademark infringement and unfair competition and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards, summary judgment is also granted on the unfair competition claim under the Lanham Act. See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).

## 2. Trademark Dilution under the Lanham Act

To establish trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), Plaintiffs must show: (1) Plaintiffs own a mark that qualifies as a "famous" mark, that is, a mark "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner"; (2) Mr. Kazhiloti made commercial use in interstate commerce of a mark or trade name; (3) such use began after Plaintiffs' mark became famous; and (4) Mr. Kazhiloti's use of the mark or trade name is likely to either cause dilution by blurring (by lessening the capacity of Plaintiffs' mark to identify and distinguish goods or services), or dilution by tarnishment (by harming the reputation of

Plaintiffs' mark). <u>See</u> 15 U.S.C. § 1125(c)(1); <u>see also</u> <u>Starbucks Corp. v. Wolfe's Borough</u>
<u>Coffee, Inc.</u>, 588 F.3d 97, 104-05 (2d Cir. 2009).

There is no genuine issue of fact as to these four elements.  As to the determination of the
first element, of the "famous" nature of the marks, the Court is directed by four non-exclusive
factors set forth in Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c):  (1) the duration,
extent, and geographic reach of advertising and publicity of the mark, whether advertised or
publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales
or goods or services offered under the mark; (3) the extent of actual recognition of the mark; (4)
whether the mark was registered under the relevant Act or the principal register.

The CARTIER and VAN CLEEF & ARPEELS marks have been used in the United
States since at least as early as 1958 and 1939, respectively.  The marks are used worldwide and
throughout the United States through limited boutiques, the respective companies' websites, and
limited authorized third-party retailers.  Plaintiffs engage in substantial advertising and
promotion of its goods using these marks in the United States.  For example, since April 1, 2007,
Cartier has spent hundreds of millions of dollars, and Van Cleef & Arpels tens of millions of
dollars on advertising and promotion campaigns.  Each Plaintiff has yielded sales of hundreds of
millions of dollars' worth of products under the CARTIER or VAN CLEEF & ARPELS mark in
the United States.  As earlier indicated, these marks are registered on the principal register.  Mr.
Kazhiloti has submitted no evidence to the contrary, and the undisputed evidence shows the
marks to be famous.  Moreover, Mr. Kazhiloti sold the counterfeit goods from his offices in New
York to the DM Defendants, whom he knew to own retail locations in New Jersey, and accepted
payment from the DM Defendants' New Jersey-based bank accounts.  Mr. Kazhiloti's actions
have lessened the capacity of Plaintiffs' marks to exclusively identify and distinguish Plaintiffs'

products, and have harmed the reputation of Plaintiffs' marks by associating them with Kazhiloti's lower-quality goods.  (See Pls.' MSJ Br., Hallerman Decl. ¶¶ 17-20; McCartney Decl. ¶¶ 22-23; Bibet Decl. ¶¶ 12-13; Luchsinger Decl. ¶ 33; Abramo Decl. ¶ 28.)

No reasonable trier of fact could find for Mr. Kazhiloti on Plaintiffs' federal trademark dilution claim with respect to the CARTIER and VAN CLEEF & ARPELS marks, and therefore Plaintiffs are entitled to summary judgment on this count.

### 3.  New Jersey Law Claims

Plaintiffs' claims for relief for under New Jersey statutory law for unfair competition, trademark dilution, and common law unfair competition are co-extensive with the relevant Lanham Act claims discussed above.  New Jersey law provides for civil liability against those who appropriate trademarks, N.J.S.A. § 56:4-1 et seq, and those whose use of a trademark dilutes the distinctive quality of the owner's mark, N.J.S.A. § 56:3-13.20.  Liability under the Lanham Act for the analogous claim is sufficient to establish liability under state law.

### 4.  Relief

The Court may grant permanent injunctive relief to remedy trademark counterfeiting and other violations established in Plaintiff's Amended Complaint in order to prevent future infringement.  See 15 U.S.C. § 1116(a).  To obtain a permanent injunction, Plaintiffs must show: (1) the Court's exercise of equity jurisdiction is proper; (2) the Plaintiffs succeeded on the merits; (3) the balance of equities tips in favor of injunctive relief.  Chanel, Inc. v. Gordashevsky, 558 F. Supp. 2d at 539 (citing Roe v. Operation Rescue, 919 F.2d 857, 868 n. 8 (3d Cir. 1990)).  The Court already vetted these elements and found in favor of Plaintiffs for permanent injunctive relief against CDU.   (See Order Granting Def. J. at 6 –9, Sept. 2, 2011, ECF 72.)  The same reasoning and conclusion is coextensive as to Mr. Kazhiloti.

Plaintiffs seek statutory damages in an amount set by the Court pursuant to 15 U.S.C. § 1117(c).  The Lanham Act provides for statutory damages at plaintiffs' election of $1,000 to $200,000 per counterfeit mark per type of goods sold, offered for sale or distributed, as the court considers just.  15 U.S.C. § 1117(c) (1).   Additionally, "if the court finds that the use of the counterfeit mark was willful," then the maximum statutory damages award is $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.  15 U.S.C. § 1117(c) (2).  Within these ranges, it is left to the Court's discretion to determine an amount that will both compensate the plaintiff and deter and punish the defendant.

Thus, pursuant to 15 U.S.C. § 1117(c), the baseline amount of damages is calculated by the number of counterfeit goods sold or offered for sale, multiplied by the number of trademarks at issue, and multiplied by the variety of goods sold or offered.  See also Chanel, Inc. v. Guetae, Civ. No. 07-3309, 2009 U.S. Dist. LEXIS 49365 (June 8, 2009) (J. Greenaway).  That figure is then trebled pursuant to 15 U.S.C. § 1117(b), whether the violation consists of intentionally using a mark, knowing it to be counterfeit, in the connection with its sale, offering for sale, or distribution, or providing goods or services necessary to the commission of such violation, with the intent that the recipient of the goods or services would put the goods or services in use in committing the violation. See 15 U.S.C. § 1117(b) (1), (2).  The claimant "generally has the burden of proving by credible evidence to a reasonable certainty his damage, and the amount thereof must be established at least to a reasonable certainty." Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 178-79 (3d Cir. 2005) (internal reference omitted).

The Court previously found that CDU's conduct was willful, and awarded statutory damages of $37,412,700.  (See Order Granting Def. J., Sept. 2, 2011, ECF 72.)  With respect to Mr. Kazhiloti, Plaintiffs request a statutory award of $43,168,500, which accounts for the

original good-and-mark combinations calculated against CDU based on the twenty-six counterfeit goods seized or purchased from the DM Defendants, in addition to the products offered for sale on the DM Defendants' website and Mr. Kazhiloti's product sheets, for a total of thirty good-and-mark combinations.

Here, the JPMorgan bank records subpoenaed by Plaintiffs show that Mr. Kazhiloti, through his company CDU, received $479,650 in payments from the DM Defendants. There are thirty good-and-mark combinations associated with the counterfeit goods that were seized or purchased from the DM Defendants, the products offered for sale on the DM Defendants' website, and the products offered for sale on Mr. Kazhiloti's products sheets. Multiplying $479,650 by 30 yields $14,389,500, the baseline damage amount. Because Mr. Kazhiloti's counterfeiting was willful, the Court trebles these damages to equal $43,168,500 in total statutory damages. This figure is well below the $2 million maximum statutory cap per counterfeit mark per type of good, for which there are thirty good-and-mark combinations here.[2]

Because Mr. Kazhiloti willfully engaged in these counterfeiting activities, an award of reasonable attorneys' fees is proper pursuant to 15 USC § 1117(b). Plaintiffs are entitled to costs pursuant to 16 USC § 1117(a). Plaintiffs are also entitled to prejudgment interest on the statutory damages, attorneys' fees and costs award, running from the date the Amended Complaint was served on Mr. Kazhilti (April 20, 2010) through the date judgment is entered pursuant to 15 USC § 1117(b). Last, Plaintiffs are entitled to postjudgment interest pursuant to 28 USC § 1961.

### III. CONCLUSION

---

[2]    The total statutory damages award of $43,168,500 is inclusive of any amount payable pursuant to the statutory damages award of $37,412,700 made by Judge Linares in his Order granting Plaintiffs' Motion for Default Judgment against CDU, dated September 2, 2011. (See Order Granting Def. J., Sept. 2, 2011, ECF 72.)

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in full as to all counts for violations of the Lanham Act for trademark infringement and counterfeiting under 15 USC § 1114(1); unfair competition and false advertising under 15 USC § 1125(a); trademark dilution and tarnishment under 15 USC § 1125(c); and analogous New Jersey law claims for unfair competition, N.J.S.A.§ 56:4-1, et seq.; trademark dilution and tarnishment, N.J.S.A. § 56:3-13.20; and unfair competition under New Jersey common law.  Permanent injunctive relief is warranted, as are statutory damages of $43,168,500, plus reasonable attorney fees, costs, and prejudgment and postjudgment interest.  The Court shall enter a Judgment and Order implementing this Opinion.


**/s/ Dickinson R. Debevoise**
**DICKINSON R. DEBEVOISE, U.S.S.D.J.**


**Dated:  October 8, 2013**